KSC/04.29.22

USDC- BALTIMORE
'22 JUN 9 AM 11:2

**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*

---

*Kim Y. Oldham*      *Mailing Address:*      *Office Location:*      *DIRECT: 410-209-4944*
*Assistant United States Attorney*    *36 S. Charles Street, 4th Floor*    *36 S. Charles Street, 4th Floor*    *MAIN: 410-209-4800*
*Kim.Oldham@usdoj.gov*      *Baltimore, MD 21201*      *Baltimore, MD 21201*      *FAX: 410-962-3124*

May 13, 2022

Gary E. Proctor, Esq.
8 E. Mulberry Street
Baltimore, Maryland 21202

       Re:    <u>United States v. Daquante Thomas</u>
            Criminal No. CCB-21-494

Dear Counsel:

       This letter, together with the Sealed Supplement, confirms the plea agreement (this "Agreement") that has been offered to your client, Daquante Thomas (hereinafter "Defendant"), by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have the Defendant execute it in the spaces provided below. If this offer has not been accepted by May 31, 2022, it will be deemed withdrawn. The terms of the Agreement are as follows:

Offense of Conviction

       1.      The Defendant agrees to plead guilty to Count Five of the Indictment, which charges the Defendant with Use and Discharge of a Firearm During a Crime of Violence Resulting in Death, in violation of 18 U.S.C. § 924(c) and 18 U.S.C. § 924(j). The Defendant admits that the Defendant is, in fact, guilty of the offense and will so advise the Court.

Elements of the Offense

       2.      The elements of the offense to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows: That on or about the time alleged in the Indictment, in the District of Maryland, the Defendant with respect to Count Five:

           a.    committed a federal crime of violence;
           b.    used or carried a firearm during or in furtherance of such a crime;
           c.    death resulted by the use of the firearm; and
           d.    the death was caused by murder as defined in 18 U.S.C. §1111.

<u>Penalties</u>

3.  The maximum penalties provided by statute for the offenses to which the Defendant is
    pleading guilty are as follows:

| Count | Statute | Minimum Prison | Maximum Prison | Supervised Release | Maximum Fine | Special Assessment |
|-------|---------|----------------|----------------|--------------------|--------------|--------------------|
| 5 | 18 U.S.C. §924(j) | 10 years | Life | 5 years | $250,000 | $100 |

         a.     Prison:  If the Court orders a term of imprisonment, the Bureau of Prisons has sole discretion to designate the institution at which it will be served.

         b.     Supervised Release:  If the Court orders a term of supervised release, and the Defendant violates the conditions of supervised release, the Court may order the Defendant returned to custody to serve a term of imprisonment as permitted by statute, followed by an additional term of supervised release.

         c.     Restitution:  The Court may order the Defendant to pay restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.

         d.     Payment:  If a fine or restitution is imposed, it shall be payable immediately, unless the Court orders otherwise under 18 U.S.C. § 3572(d).  The Defendant may be required to pay interest if the fine is not paid when due.

         e.     Forfeiture:  The Court may enter an order of forfeiture of assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property subject to forfeiture.

         f.     Collection of Debts:  If the Court imposes a fine or restitution, this Office's Financial Litigation Unit will be responsible for collecting the debt.  If the Court establishes a schedule of payments, the Defendant agrees that: (1) the full amount of the fine or restitution is nonetheless due and owing immediately; (2) the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment; and (3) the United States may fully employ all powers to collect on the total amount of the debt as provided by law.  Until the debt is paid, the Defendant agrees to disclose all assets in which the Defendant has any interest or over which the Defendant exercises direct or indirect control.  Until the money judgment is satisfied, the Defendant authorizes this Office to obtain a credit report in order to evaluate the Defendant's ability to pay, and to request and review the Defendant's federal and state income tax returns.  The Defendant agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) and a financial statement in a form provided by this Office.

## Waiver of Rights

4. The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as outlined below:

      a.     If the Defendant had pled not guilty and persisted in that plea, the Defendant would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

      b.     If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

      c.  If the Defendant went to trial, the Government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the Government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in defense, however, the Defendant would have the subpoena power of the Court to compel the witnesses to attend.

      d.  The Defendant would have the right to testify in the Defendant's own defense if the Defendant so chose, and the Defendant would have the right to refuse to testify. If the Defendant chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from the Defendant's decision not to testify.

      e.  If the Defendant were found guilty after a trial, the Defendant would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

      f.  By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that the Defendant may have to answer the Court's questions both about the rights being given up and about the facts of the case. Any statements that the Defendant makes during such a hearing would not be admissible against the Defendant during a trial except in a criminal proceeding for perjury or false statement.

      g.  If the Court accepts the Defendant's plea of guilty, the Defendant will be giving

up the right to file and have the Court rule on pretrial motions, and there will be no further trial or proceeding of any kind in the above-referenced criminal case, and the Court will find the Defendant guilty.

h.  By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status, including possible denaturalization. The Defendant recognizes that if the Defendant is not a citizen of the United States, or is a naturalized citizen, pleading guilty may have consequences with respect to the Defendant's immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including the Defendant's attorney or the Court, can predict with certainty the effect of a conviction on immigration status. The Defendant is not relying on any promise or belief about the immigration consequences of pleading guilty. The Defendant nevertheless affirms that the Defendant wants to plead guilty regardless of any potential immigration consequences.

## Advisory Sentencing Guidelines Apply

5.  The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. § 3551-3742 (excepting 18 U.S.C. § 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

## Factual and Advisory Guidelines Stipulation

6.  This Office and the Defendant stipulate and agree to the Statement of Facts set forth in Attachment A, which is incorporated by reference herein.

a.  This Office and the Defendant agree that the applicable base offense level is **43** pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 2K2.1(c)(1)(B) and § 2A1.1 based on the fact that the defendant used a firearm in connection with the commission of murder for hire, and death resulted.

b.  This Office does not oppose a 2-level reduction in the Defendant's adjusted offense level pursuant to U.S.S.G. § 3E1.1(a) based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the Defendant's criminal conduct. This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional 1-level decrease in recognition of the Defendant's timely notification of the Defendant's intention to enter a plea of guilty. This Office may oppose any adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1(a), and may decline to make a motion pursuant to U.S.S.G. § 3E1.1(b), if the Defendant: (i) fails to admit each and every item in the factual stipulation; (ii) denies involvement in the offense; (iii) gives conflicting statements about the Defendant's involvement in the offense; (iv) is

untruthful with the Court, this Office, or the United States Probation Office; (v) obstructs or attempts to obstruct justice prior to sentencing; (vi) engages in any criminal conduct between the date of this Agreement and the date of sentencing; (vii) attempts to withdraw the plea of guilty; or (viii) violates this Agreement in any way.

      c.     Therefore, the total offense level is **40.**

7. There is no agreement as to the Defendant's criminal history and the Defendant understands that the Defendant's criminal history could alter the Defendant's offense level. Specifically, the Defendant understands that the Defendant's criminal history could alter the final offense level if the Defendant is determined to be a career offender or if the instant offense was a part of a pattern of criminal conduct from which the Defendant derived a substantial portion of the Defendant's income.

8. Other than as set forth above, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines are in dispute or will be raised in calculating the advisory guidelines range.

Obligations of the Parties

9.     At the time of sentencing, this Office and the Defendant reserve the right to advocate for a reasonable sentence, period of supervised release, and/or fine considering any appropriate factors under 18 U.S.C. § 3553(a). This Office and the Defendant reserve the right to bring to the Court's attention all information with respect to the Defendant's background, character, and conduct that this Office or the Defendant deem relevant to sentencing, including the conduct that is the subject of any counts of the Indictment. At the time of sentencing, this Office will move to dismiss any open counts against the Defendant.

Waiver of Appeal

10.     In exchange for the concessions made by this Office and the Defendant in this Agreement, this Office and the Defendant waive their rights to appeal as follows:

      a.     The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or any other statute or constitutional provision, to appeal the Defendant's conviction on any ground whatsoever. This includes a waiver of all right to appeal the Defendant's conviction on the ground that the statute(s) to which the Defendant is pleading guilty is unconstitutional, or on the ground that the admitted conduct does not fall within the scope of the statute(s), to the extent that such challenges legally can be waived.

      b.     The Defendant and this Office knowingly and expressly waive all rights conferred by 18 U.S.C. § 3742 to appeal whatever sentence is imposed (including any term of imprisonment, fine, term of supervised release, or order of restitution) for any reason (including the establishment of the advisory sentencing guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and any constitutional

5

challenges to the calculation and imposition of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release), except as follows:

       i.     The Defendant reserves the right to appeal any sentence that exceeds the statutory maximum; and

       ii.     This Office reserves the right to appeal any sentence below a statutory minimum.

       c.     The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

Forfeiture

11.    The Defendant understands that the Court may enter an Order of Forfeiture as part of the Defendant's sentence, and that the Order of Forfeiture may include assets directly traceable to the offense(s), substitute assets, and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offenses.

12.    Specifically, but without limitation on the Government's right to forfeit all property subject to forfeiture as permitted by law, the Defendant agrees to forfeit to the United States all of the Defendant's right, title, and interest in items that the Defendant agrees constitute money, property, and/or assets derived from or obtained by the Defendant as a result of, or used to facilitate the commission of, the Defendant's illegal activities.

13.    The Defendant agrees to consent to the entry of orders of forfeiture for the property described herein and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J), 32.2, and 43(a) regarding notice of the forfeiture in the charging instrument, advice regarding forfeiture during the change of plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment.

14.    The Defendant agrees to assist fully in the forfeiture of the above property. The Defendant agrees to disclose all assets and sources of income, to consent to all requests for access to information related to assets and income, and to take all steps necessary to pass clear title to the forfeited assets to the United States, including executing all documents necessary to transfer such title, assisting in bringing any assets located outside of the United States within the jurisdiction of the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are made available for forfeiture.

15.    The Defendant waives all challenges to any forfeiture carried out in accordance with this Agreement on any grounds, including any and all constitutional, legal, equitable, statutory, or administrative grounds brought by any means, including through direct appeal, habeas corpus petition, or civil complaint. The Defendant will not challenge or seek review of any civil or administrative forfeiture of any property subject to forfeiture under this Agreement,

6

and will not assist any third party with any challenge or review or any petition for remission of forfeiture.

Restitution

16.     The Defendant agrees to the entry of a restitution order for the full amount of the victims' losses. The Defendant agrees that, pursuant to 18 U.S.C. §§ 3663 and 3663A and 3563(b)(2) and 3583(d), the Court may order restitution of the full amount of the actual, total loss caused by the offense conduct set forth in the factual stipulation. The total amount of restitution shall be due immediately and shall be ordered to be paid forthwith. Any payment schedule imposed by the Court establishes only a minimum obligation. Defendant will make a good faith effort to pay any restitution. Regardless of Defendant's compliance, any payment schedule does not limit the United States' ability to collect additional amounts from Defendant through all available collection remedies at any time. The Defendant further agrees that the Defendant will fully disclose to this Office, the probation officer, and to the Court, subject to the penalty of perjury, all information (including but not limited to copies of all relevant bank and financial records) regarding the current location and prior disposition of all funds obtained as a result of the criminal conduct set forth in the factual stipulation. The Defendant further agrees to take all reasonable steps to retrieve or repatriate any such funds and to make them available for restitution. If the Defendant does not fulfill this provision, it will be considered a material breach of this Agreement, and this Office may seek to be relieved of its obligations under this Agreement.

Defendant's Conduct Prior to Sentencing and Breach

17.     Between now and the date of the sentencing, the Defendant will not engage in conduct that constitutes obstruction of justice under U.S.S.G. § 3C1.1; will not violate any federal, state, or local law; will acknowledge guilt to the probation officer and the Court; will be truthful in any statement to the Court, this Office, law enforcement agents, and probation officers; will cooperate in the preparation of the presentence report; and will not move to withdraw from the plea of guilty or from this Agreement.

18.     If the Defendant engages in conduct prior to sentencing that violates the above paragraph of this Agreement, and the Court finds a violation by a preponderance of the evidence, then: (i) this Office will be free from its obligations under this Agreement; (ii) this Office may make sentencing arguments and recommendations different from those set out in this Agreement, even if the Agreement was reached pursuant to Rule 11(c)(1)(C); and (iii) in any criminal or civil proceeding, this Office will be free to use against the Defendant all statements made by the Defendant and any of the information or materials provided by the Defendant, including statements, information, and materials provided pursuant to this Agreement, and statements made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure. A determination that this Office is released from its obligations under this Agreement will not permit the Defendant to withdraw the guilty plea. The Defendant acknowledges that the Defendant may not withdraw the Defendant's guilty plea—even if made pursuant to Rule 11(c)(1)(C)—if the Court finds that the Defendant breached the Agreement. In that event, neither the Court nor the Government will be bound by the specific sentence or sentencing range agreed and stipulated to herein pursuant to Rule 11(c)(1)(C).

7

## Court Not a Party

19.     The Court is not a party to this Agreement.  The sentence to be imposed is within the sole discretion of the Court.  The Court is not bound by the Sentencing Guidelines stipulation in this Agreement.  The Court will determine the facts relevant to sentencing.  The Court is not required to accept any recommendation or stipulation of the parties.  The Court has the power to impose a sentence up to the maximum penalty allowed by law.  If the Court makes sentencing findings different from those stipulated in this Agreement, or if the Court imposes any sentence up to the maximum allowed by statute, the Defendant will remain bound to fulfill all of the obligations under this Agreement.  Neither the prosecutor, defense counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive.  The Defendant agrees that no one has made such a binding prediction or promise.

## Entire Agreement

20.     This letter, together with the Sealed Supplement, constitutes the complete plea agreement in this case.  This letter, together with the Sealed Supplement, supersedes any prior understandings, promises, or conditions between this Office and the Defendant.  There are no other agreements, promises, undertakings, or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement.  No changes to this Agreement will be effective unless in writing, signed by all parties and approved by the Court.

If the Defendant fully accepts each and every term and condition of this Agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Erek L. Barron
United States Attorney

_____/S/_____
Kim Y. Oldham
Lindsey N. McCulley
Assistant United States Attorney

8

I have read this Agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

5-24-22

Date

Daquante Thomas

I am the Defendant's attorney. I have carefully reviewed every part of this Agreement, including the Sealed Supplement with the Defendant. The Defendant advises me that the Defendant understands and accepts its terms. To my knowledge, the Defendant's decision to enter into this Agreement is an informed and voluntary one.

5-24-22

Date

Gary E. Proctor, Esquire

9

## ATTACHMENT A

### STIPULATION OF FACTS

*The undersigned parties stipulate and agree that if this case had proceeded to trial, this Office would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

On October 4, 2020 at approximately 2:38 p.m. hours, the Howard County Police ("HCPD") responded to 9687 Basket Ring Rd, Columbia, Maryland for the report of a shooting. The address is part of the Verona Apartment complex in a neighborhood of Howard County known as Oakland Mills. Upon arrival, officers observed a black male lying on the sidewalk in front of 9689 Basket Ring Rd. The victim was identified as 23-year-old Juan Michael Ross ("Ross") and pronounced dead at the scene. Investigators recovered two different types of shell casings from the scene - 9 mm and .40 caliber. According to the autopsy, Ross was shot eight times. Six of the gunshot wounds were to Ross's head, indicating a clear intent to kill Ross.

The Defendant with the intent that a murder be committed in violation of the laws of the state of Maryland as consideration for the receipt of money, used and caused another to use a cell phone, i.e., a facility of interstate commerce. During the course of that murder for hire, the Defendant and his co-conspirator discharged firearms and death resulted from those discharges (i.e., the death of Ross). That death was a murder as defined by 18 U.S.C. § 1111.

The Defendant admits that he was, in fact, the person in the red hoodie and did shoot Ross. He also agrees that he and his co-conspirators used the suspect vehicle to drive to and from the murder. According to multiple individuals who spoke to investigators, Ross was known to sell marijuana in the Oakland Mills area and often hung out in the Verona Apartments. The vehicle he had been driving that day was parked near his body and contained a large quantity of marijuana in the trunk.

Following the murder, witnesses gave descriptions of two shooters that got out of a suspect vehicle, described as both being young black male suspects approximately 5'10" to 6' tall, thin build:

> Suspect #1 –   black hoodie,  blue surgical mask, black boots (referred to in
> the Indictment as Conspirator 2)
> Suspect #2 -   red hoodie (Daquante THOMAS)

Immediately following the murder, investigators learned from various individuals that Co-conspirator A hired someone to kill Ross because Co-conspirator A suspected that Ross was a "snitch." The Defendant admits that he participated in the murder of Ross with Co-conspirator A and Co-conspirator B.

Co-conspirator A was from Columbia and was known to sell drugs. Ross was arrested in Prince George's County, Maryland on September 5, 2020 and charged with various gun and drug offenses. Bond was set and Ross was released the next day. On September 9, 2020, an Instagram Live video captured an argument between Co-conspirator A, using the screen name Kingblac4873, and Ross about whether Ross was a "rat." During the argument, Ross called Co-conspirator A a "fake ass Crip" and told him to "fuck off my damn live" (referring to Ross' live video). Investigators subsequently obtained text messages between Co-conspirator A and Ross from the month of September about Ross having what Co-conspirator A called a "get out of jail free card." Investigators also recovered a group text on Co-conspirator's phone with screen shots of Maryland Judiciary Case Search showing other prior cases in which Ross had been charged with offenses that were later dismissed. The topic of the group chat was whether Ross was a snitch.

On or about September 12, 2020, Co-conspirator A contacted conspirator 1 and solicited conspirator 1 to murder Ross in exchange for money. Conspirator 1 was familiar with the Columbia area and knew of Ross through social media. Co-conspirator A gave Conspirator 1 partial payment, a gun, and directed Conspirator 1 to look for Ross in the Oakland Mills area of Columbia. Conspirator 1 initially agreed to commit the crime but subsequently backed out of the plan after Co-conspirator A continued to press Conspirator 1 about Conspirator 1 taking too long. This is corroborated by text messages between Co-conspirator A and Conspirator 1 that were later recovered by investigators from Co-conspirator A's cellphone. The below text messages are just some of those sent by Co-conspirator A to Conspirator 1 in September of 2020:

- Them my Intown pples jus hit me…they tryin come round but ima stall on them
- I'm not going hold you bro this my life we talkin bout I aint goin be able to stall forever niggas on me I cant be movin like this bro
- Wya [slang for "where you at?"]
- Smh [slang for "shaking my head"] bro u not serious bro
- Yo was just right there bro
- He was jus out bro
- This 1 might be to much for u bro
- You don't be on it bro, niggas sit for 8-9 hours at a time bro not 1-2 hours bro
- I ain't mad at u or nothin dummy but I got get this shit done it's been to long
- And bro I gave you my bread [slang for money] and my bippy [slang for gun] bro I'm seeing wassup bro that's all Dummy niggas askin me shit and I got answer dummy
- If u serious bro 1st thing in morning
- I ain't mad at you bro I jus need the bippy & bread dummy

A cell phone number attributed to Co-conspirator B was saved in Co-conspirator A's phone contacts as "LIL TY." At 5:21 p.m., the day of the Ross murder, Co-conspirator B texted a cellphone number attributed to Co-Conspirator A that he had something important to discuss and asked when Co-conspirator A was getting back. Co-conspirator A told Co-conspirator B to Facetime him. On October 6, Co-conspirator B told Co-conspirator A to call him "ASAP." On October 7, Co-conspirator B texted Co-conspirator A "it's going to be hot as shit out here" to which Co-conspirator A replied, "It already is bro." On October 13, Co-conspirator B tried to Facetime Co-conspirator A twice, but the calls were not answered.

A witness to the murder conducted an internet search on their cellphone to identify the type of vehicle driven by the suspects. The witness was standing with Ross when the murder occurred. Investigators retrieved a screenshot of a Honda Crosstour from the witness's cellphone. Witnesses at the crime scene described the path driven by the suspect vehicle as it left the area. Camera footage from nearby Talbot Springs Elementary School captured a dark colored sedan traveling eastbound on White Acre Rd toward Thunder Hill Road (away from the murder scene) at approximately 2:38 p.m., the same time the first 911 call was made. Another home security video showed a similar dark colored vehicle traveling northbound on Thunder Hill Road towards Route 175, the main highway that runs through Columbia, Maryland.

Investigators also checked for footage at the Walgreens Drug Store located off of Thunder Hill Road, located approximately one-tenth of a mile from Route 175 and 1 mile from the murder scene. They identified a vehicle matching the suspect vehicle enter the store parking lot at 2:07 p.m., a half hour before the murder. The following additional observations were made:

Subject #1, determined to be Co-conspirator B, exited the driver's seat of the car, and walked with a noticeable limp into the Walgreen's store. Co-conspirator B purchased an Uber card and could be seen on a cellphone as he walked out of the store.

Subject #2 exited the passenger side *rear*, indicating that someone was already seated in the front passenger seat. Investigators believe that person to be Daquante THOMAS. Co-conspirator B handed something to Subject #2, who then got into the driver's seat. The Crosstour drove off at 2:15 p.m. and Co-conspirator B walked off camera view.

Investigators obtained purchase information from Uber about the gift card bought at Walgreen's by Co-conspirator B at 2:12 p.m. The prepaid card was linked to an account under the name Ty Ty with the same phone number attributed to Co-conspirator B that was saved in Co-conspirator's A cellphone.

According to Uber, there were two separate Uber trips on this account requested on the day of the murder. At 2:13 p.m., Co-conspirator B requested to be picked up at the Walgreen's and driven to his aunt's residence at 6161 Quiet Times, Columbia, MD. The Uber driver described the rider as walking with a limp and appearing worries. At 4:16 p.m., Co-conspirator B requested to be picked up from 6161 Quiet Times and driven to Twin Rivers Rd in Columbia. Co-conspirator B was picked up at 4:19 p.m. During the drive, the rider changed his destination and went to Shipley's Grant Shopping Center located at the 5700 block of Richards Valley Rd, Ellicott City, MD, where Co-conspirator B waited for someone. Co-conspirator B then got out of the Uber car, met with a female in a car and grabbed something from her bag that the rider then put it in his pocket. Surveillance footage from the Verizon Store at Shipley's Grant shopping center captured the Uber rider (Co-conspirator B) standing at the driver's window of another car for approximately 5 seconds, then getting back into the Uber car. Both cars left immediately. The Uber driver then drove Co-conspirator B to his final requested destination of 1907 Lemmon St in Baltimore, an area where Co-conspirator B was known to sell drugs.

Investigators obtained a state search warrant for the iCloud accounts associated with the Uber account and learned that both accounts are used by Co-conspirator B. The accounts contained

photos of Co-conspirator B, including photos of Co-conspirator B and Daquante THOMAS together, and e-mails as recent as October 2, 2020 between Co-conspirator B and BGE about starting service at 305 W. Fayette St, Apt 1213 in Baltimore City.

Below is a recovered text message exchange between Co-conspirator B's cellphone and THOMAS's cellphone the day before the murder, October 3, 2020:

| Co-conspirator B: | Want the addy for the 6 |
| THOMAS: | What addy? |
| Co-conspirator B: | 9665 basket ring apt 3 |
| THOMAS: | Rd |
| Co-conspirator B: | Ima show u who they is |
| THOMAS: | Rd |
| Co-conspirator B: | Fya |
| Co-conspirator B: | He trying to get it done ASAP rocky |

Conspirator 1 would testify that $5,000 was less than the "going rate" for a contract killing. Hence, "for the 6" likely refers to the cost of the murder ($6,000). The address 9665 Basket Ring, Apt 3 is in the Verona Apartment complex where Ross was killed. This particular apartment was leased to a friend of Co-conspirator A's girlfriend. This friend knew Ross well and Ross was known to hang out the apartment almost daily. The Defendant agrees that Co-conspirator B texted him this address so he would know where to go to find the individual he was to kill. The Defendant also agrees that he was paid to kill Ross.

On October 4th, the morning of the murder, Citi Watch videos from Baltimore City captured images of the Honda Crosstour. At 10:51 a.m., a camera located at the intersection of N. Howard and W. Fayette St captured the Honda Crosstour parked in front of a McDonald's. A black male wearing a red hoodie (THOMAS) exited the driver's seat, entered the McDonald's, came back out, and got back into the Crosstour. McDonald's camera footage from inside the restaurant captured THOMAS wearing a red hooded sweatshirt. A few minutes later, a camera captured the Crosstour at the intersection of Eutaw St. and W. Baltimore St. Given the car's direction of travel, the car likely turned into the Center Point Garage, the parking garage for Co-conspirator B's apartment building. According to the MVA, THOMAS's girlfriend, I.M., drove a 2010 gray Honda Crosstour.

On October 4, 2020 at 12:18 p.m., THOMAS and his girlfriend, I.M., engaged in the following text message exchange that placed THOMAS with Co-conspirator B a few hours before the murder:

| THOMAS: | Wyd [What you doing] |
| I.M.: | Ard |
| I.M.: | Nothing you |
| THOMAS: | Nun Rey go out Columbia with [Co-conspirator B]. |

Cell site location information during this time period for both THOMAS and Co-conspirator B's phone showed them traveling from Baltimore City to Columbia. The next

exchange between THOMAS and I.M. occurred an hour before the homicide, confirming that THOMAS and Co-conspirator B were still together in Howard County.

| | |
|---|---|
| I.M.: | & wya |
| THOMAS: | [Co-conspirator B] and the county |
| I.M.: | Don't let him drive all crazy & allat in my car. |
| I.M.: | & don't me no ticket |
| THOMAS: | I'm not iyanna and he not driving fast |

I.M. also asked THOMAS to "Ask [Co-conspirator B] can he get me high when I get off." At 1:56 p.m., both Co-conspirator B and THOMAS's cellphones were in the immediate area of the shooting, most likely looking for Ross. At approximately 1:59 p.m., Ross posted an Instagram photo of himself walking to the Verona Apartments.   At 2:07 p.m., both THOMAS and Co-conspirator B's cellphones are in the area of the Walgreen's store where Co-conspirator B purchased the Uber card. THOMAS's cellphone was back in the area of the homicide at 2:37 p.m. The Defendant agrees that after locating Ross, Co-conspirator B and THOMAS went to Walgreen's so that Co-conspirator B could request an Uber and leave the area, while THOMAS and conspirator 2 went back to the Verona Apartments to murder Ross.

Subsequent phone calls from I.M. to THOMAS right before the homicide go unanswered by THOMAS who does not respond to her until 4:01 p.m.  And Co-conspirator B does not text THOMAS after the two separated until after 4 p.m. when Co-conspirator B simply says, "hit me."

Neither of the firearms used to commit Ross's murder were recovered, nor was the red hooded sweatshirt that THOMAS wore during the crime.   In a jail call the day after his arrest, a female told THOMAS that she doesn't recall him getting rid of "that hoodie" and that there is a picture of him at the McDonald's. THOMAS responded, "mm hmm, with that whole outfit on."

Investigators learned that THOMAS went by the nickname "Glock" because he likes to carry that brand of firearm on him.   THOMAS's cellphone contained text messages with an individual from October 21, 2020, in which THOMAS was trying to sell a Smith and Wesson .40 caliber for $800. When the individual claimed that $800 was too high a price, THOMAS texted, "smith and wesson more accuracies you don't know no better."

SO STIPULATED:

/S/
Kim Y. Oldham
Assistant United States Attorney

Daquante Thomas
Defendant

Gary E. Proctor, Esquire
Counsel for Defendant